UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMARA MURAY,

        Plaintiff,

v.

DAWN FOODS, INC., a Michigan corporation,

        Defendant.
                                    /

Case No. 09-cv-12160

HONORABLE STEPHEN J. MURPHY, III

**ORDER GRANTING DAWN'S MOTION
FOR SUMMARY JUDGMENT** (docket no. 19)

Tamara Muray filed a complaint in this Court against Dawn Foods, Inc. ("Dawn"), her former employer, on June 3, 2009. She alleged that Dawn discriminated against her on the basis of her sickle cell anemia and took retaliatory actions after she filed complaints with the Michigan Department of Civil Rights ("MDCR"), in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101–213.[1] Dawn now moves for summary judgment on all counts in Muray's complaint. Docket No. 19. The Court agrees that Muray has not

---

[1] Muray also brought claims under Title VII of the Civil Rights Act of 1964, and Michigan's Elliot-Larsen Civil Rights Act. Neither of these statutes enjoin discrimination on the basis of a disability. *See* 42 U.S.C. § 2000e-2 ("race, color, religion, sex, or national origin . . . ."); Mich. Comp. Laws § 37.2102 ("religion, race, color, national origin, age, sex, height, weight, familial status, or marital status . . . ."). The Court will grant summary judgment for Dawn on these claims.
    Muray's complaint also contains a count of "wrongful termination." The common law of Michigan prohibits certain discharges of employees that are contrary to public policy. *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 695 (1982). But such a claim cannot be maintained if there is already a statutory remedy covering a particular public policy concern. *Lewandowski v. Nuclear Mgmt. Co., LLC*, 272 Mich. App. 120, 127 (2006). Because the ADA covers the field of disability discrimination, the Court will also grant summary judgment for Dawn on the wrongful termination claim.

created a triable issue of fact on any of her ADA claims. Accordingly, the Court will grant the motion for summary judgment and dismiss this case.

## STATEMENT OF FACTS

Dawn hired Muray in 2005 as a full-time accounts payable representative in their financial department, after previous work for the company as a temporary employee. Def.'s Mot. 2, ¶ 4. Her supervisor in that department was Marlene Meade. *Id.* Muray's job duties included answering phones, date-stamping invoices received in the mail, opening mail, and retrieving and processing a variety of financial documents, both in the office and at a nearby warehouse. *Id.* at 3, ¶ 11. The work required Muray to climb stairs, lift heavy boxes, and take a trip at least once a day to the records warehouse. *Id.* at 3, ¶ 12. Everyone in Muray's position worked full time. *Id.* at 3, ¶ 13. Muray agreed at her deposition that her job did not allow for "a lot of down-time during the day" and that she had to put in "a full day every day" to keep pace with the job's demands. Muray Dep. 82–83. Muray's job performance was adequate. She received a four-percent raise at the beginning of 2007, and another two-percent raise at the beginning of 2008, even though such raises were not required under her work contract. Def.'s Mot. 2, ¶ 8. Occasionally, Meade and other supervisors had to talk to Muray about issues with her job performance and attitude, and on one occasion, she had to be taken off a project team. *Id.* at 15 n.7; *id.* Tab E, ¶ 4.

Dawn was aware that Muray suffered from sickle cell anemia ("SCA") when she was hired, and that she was hospitalized for symptoms arising from this condition in the past. Def. Mot. 2, ¶ 5. Co-workers occasionally asked her about her condition and if she needed time off of work. *Id.* at 15, n.7. If she felt ill and could not perform a certain project, she would be temporarily excused from her duties, and other employees would

pick up the slack. *Id.* at 3, ¶ 14. In 2007, Muray requested that her desk be moved to the back of the office to get away from an air vent, because cold air exacerbated the symptoms of her SCA. *Id.* at 4, ¶ 16. Dawn accommodated this request by moving Muray further away from the vent. *Id.* Muray was apparently unhappy with these efforts because she filed a complaint with the MDCR that September, alleging disability discrimination and harassment. *Id.* at 7, ¶ 43.

On January 17, 2008, Muray requested FMLA leave because her SCA symptoms were worsening dramatically. Def.'s Mot. 4, ¶ 17. She was away from work on that leave until April 24, 2008. *Id.* at 5, ¶ 25. During her leave, she filed another MDCR complaint regarding the slightly diminished raise she received that year. *Id.* at 7, ¶ 43. Upon returning to work, Muray's doctor provided more specific instructions to Dawn as to how to accommodate Muray's condition in the office. *Id.* at Tab B, Ex. 25. His orders limited her to twenty hours of work per week for two weeks, and set permanent restrictions on exposure to "extreme hot or cold" (defined as being outside the range of sixty to ninety degrees Fahrenheit) and ventilated air. *Id.* The company learned at about this time that Muray needed to be at least twelve feet away from any air vent in the office, which required displacement of other employees from their work areas and reconfiguration of the office phone systems. *Id.* at 5, ¶ 27–28. This requirement was not fully explained to the company when Muray first complained about her proximity to the vent in 2007. Nonetheless, after Muray returned, Dawn began taking steps to reorganize the office where Muray worked to accommodate her doctor's request. *Id.*

Efforts to accommodate Muray were cut short when she took leave from work again just one week after returning, citing continuing problems with her health. Def.'s Mot. 5, ¶ 29. Sometime in May, she had an automobile accident which intensified her

3

symptoms. *Id.* at Tab B, Ex. 24. During this period of leave, which was longer than Dawn normally provided for employees, she successfully applied for long-term disability benefits from Lincoln Financial Group through Dawn, and for Social Security benefits. *Id.*, Exs. 6 & 8. Her application for those benefits required her to affirm that her illness caused unpredictable absences from work and that she did not expect to return to work. *Id.* Ex. 4; Muray Dep. 27–28, 38–39.

On May 21, 2008, Amber McKee (née Swanenpoel), a senior human resources manager at Dawn, received an order from Muray's doctor, Vernon R. Stevenson, regarding the accommodations Muray would require at work going forward. Def.'s Mot. Tab B, Ex. 24. The memo is ambiguous as to whether Muray could return to full-time work after two weeks of part-time work, or whether she would have to have her maximum hours per week capped permanently. McKee eventually placed a call with Dr. Stevenson where he claimed that he was unsure whether Muray "would ever be able to return to work." McKee Dep. 12.

Muray received a termination letter from McKee on June 28, 2008.[2] Def.'s Mot. Tab B, Ex. 25. The letter noted that Muray's applications for long-term disability benefits had been accepted, and that Muray's doctor believed she was no longer able to work more than twenty hours per week. *Id.* In her deposition, Muray did not object to the characterization of her medical condition contained in McKee's letter. Muray Dep. 150

---

[2]   Muray's brief argues that this letter was "poorly worded and unclear" because it did not use words like "terminated," "you're fired," or "discharged," opting instead for the euphemism "part ways." Def. Mot. Tab B, Ex. 25. After discussing Dawn inability to accommodate Muray, the letter states that Muray and Dawn "will need to part ways." It also discusses the possibility of being reconsidered for employment upon being medically cleared, and COBRA coverage for terminated employees. Finally, it encouraged Muray to get in touch with McKee if she had any questions, which Muray failed to do. Muray never claimed in her deposition to be confused by Dawn's letter.

("Q. You understood if you were ever released to return to work, the maximum you would be able to work is 20 hours per week; correct? A. Yes."). McKee claimed to have looked into positions at Dawn that could accommodate her part-time schedule on a permanent basis, but that no such openings were available at the time. *Id.* Since a further extension of Muray's leave was not possible, given how long Muray had already been away from work, McKee informed Muray that Dawn had to "part ways" with her. That decision eventually led to this litigation.

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" for purposes of summary judgment if proof of that fact would help establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A "genuine" dispute over material facts is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must take care, in evaluating the motion, not to prejudge the quality of the evidence, because the purpose of summary judgment is to determine the existence of a triable claim. *Doe v. Metro. Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

The moving party bears the initial burden of demonstrating that the standard of Rule 56 is met. In making this evaluation, the facts are considered in the light most favorable to the party opposing summary judgment. *La Quinta Corp. v. Heartland*

Props. LLC, 603 F.3d 327, 335 (6th Cir. 2010). Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in the case, the burden shifts to the non-moving party to present specific facts proving there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. This cannot be done by showing "a scintilla of evidence" supporting the non-moving party, or by presenting evidence that is "merely colorable" and "not significantly probative." *Id.* at 249–50, 252. Rather, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249–50. If the non-moving party successfully carries its burden, the case may proceed to trial and summary judgment is not appropriate.

**ANALYSIS**

I. <u>ADA Discrimination Claims</u>

    A. <u>Elements of a Prima Facie Claim of ADA Discrimination</u>

The ADA prohibits entities to whom it applies from discriminating "against a qualified individual on the basis of disability in regard to . . . the discharge of employees." 42 U.S.C. § 12112 (2006). In the Sixth Circuit, the test as to whether a plaintiff has made a prima facie case of discrimination under the ADA, absent direct evidence of discrimination, follows the familiar pattern set by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To make out a claim the plaintiff must demonstrate:

> 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). If these

elements are satisfied, the defendant has the burden of "'producing an explanation to rebut the prima facie case'" that is "'legitimate'" and "'nondiscriminatory.'"  *Monette*, 90 F.3d at 1185 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)). Finally, a plaintiff can still survive the summary judgment stage if the nondiscriminatory reason offered for the action is erroneous, a red herring, or insufficient to motivate the decision.  *Macy*, 484 F.3d at 366.

### B. Did Dawn Fail to Provide Reasonable Accommodations to Muray During Her Employment?

Muray's contends that Dawn violated the ADA by failing to make reasonable accommodations for her while she was still their employee, as provided by 42 U.S.C. § 12112(b)(5)(A).  This is an alternative way of pleading the adverse employment action element under the ADA.  "Reasonable accommodation" is defined permissively by the ADA to encompass many possible "accommodations" that could be deemed "reasonable" in a particular case.  This could include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," "part-time or modified work schedules," and "reassignment to a vacant position."  42 U.S.C. § 12111(9)(A)–(B).

The Court holds that Muray's claim fails on this point because there is no evidence showing that Dawn failed to undertake efforts to reasonably accommodate Muray during her employment.  On the contrary, unchallenged evidence shows that Dawn tried, as best they could, to fulfill every request Muray made to adjust the work environment to her needs.  They moved her away from the air vent when she first asked to be moved in 2007.  They met all of her medical restrictions when she returned from her leave in April of 2008, including a temporary part-time work schedule.  They even started work on a major office reconfiguration to move her desk an appropriate distance from the office's

7

air vents prior to her permanent departure.  Dawn admits that there was some delay in moving Muray the appropriate distance away from the air vent after her initial request, in part because of her doctor's confused instructions about how far away she had to be from the vent.  But a claim that an employer failed to "reasonably accommodate" a disabled person cannot be based solely on minor differences between requested accommodations and provided accommodations or excusable delays in providing service.  *See Greton v. Verizon S. Inc.* 145 Fed. App'x 159, 169 (6th Cir. 2005) (holding that a reasonable delay in providing accommodations due to outside factors or administrative issues cannot serve as the basis for ADA discrimination); *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.*, 18 Fed. App'x 455, 460 (6th Cir. 2002) ("The ADA does not entitle a disabled employee to insist on one among several reasonable accommodations.").  Muray's claim that Dawn failed to "reasonably accommodate" her needs in these matters cannot be made as a matter of law.

>   C. Was Muray a "Qualified" Individual Under the ADA When Dawn <u>Terminated Her?</u>

Muray also contends that her termination from Dawn was discriminatory.  Dawn directs its arguments for summary judgment on this count at the second element of Muray's prima facie case for ADA discrimination, that she was "otherwise qualified for the position, with or without reasonable accomodation."  The ADA defines a "qualified individual" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The statute defers to "the employer's judgment as to what functions of a job are essential."  *Id.*

There appears to be no dispute that Muray was not able to perform the functions of a full-time AP representative.  Rather, the primary disagreement the parties have is

whether Muray's proposed schedule accommodations were "reasonable" under the ADA. Muray testified in her deposition that her doctor would only permit her to work twenty hours a week upon returning from medical leave. Muray Dep. 150. The parties do not dispute that only full-time employees worked Muray's job, and that there were no permanent part-time positions available when Dawn terminated her. Furthermore, Muray has more or less admitted that she cannot guarantee an employer she can keep *any* consistent work schedule, part-time or full-time. One exchange from her deposition is particularly relevant:

> Q. (By Mr. Winegardner) You cannot, sitting here today, testify that you can work a 20 hour job, 20 hours a week, every week?
> A. I will go back to my original statement. *If my condition allows me to work 20 hours per week*, I'll be more than happy to work 20 hours a week.
> Q. But you cannot testify today that you're able to do so?
> . . . .
> A. I am. I'm telling you *if my condition allows me to work, I'll work. If my condition does not allow me to work, I will not work*.
> Q. And because of your condition, you cannot say that you can work 20 hours per week continuously week after week?
>     Mr. Bisonet:    Objection. Speculation
> A. I don't know.

Muray Dep. 161–62 (emphasis added).[3]

While the Court is highly sympathetic to persons who must live lives at the mercy of a debilitating illness, the ADA does not require an employer to provide open-ended accommodations. The Sixth Circuit holds that an employee's request for indefinite leave due to the unforeseeable duration of an impairment is not a reasonable

---

[3] Muray's brief also employs conditional language. *See, e.g.*, Pl. Resp. 9 ("Plaintiff could perform the essential functions of her position . . . . She did so for many years, and could do so today, *as long as her condition permitted*.") (emphasis added); *id.* at 10 ("[S]he is able to work, *condition permitting*.") (emphasis added); *id.* at 11 ("Plaintiff would like to work, even for Defendant, but of course her condition makes securing employment difficult as it is likely she will on occasion be unable to work.").

accommodation under the ADA. *See Walsh v. UPS*, 201 F.3d 718, 727 (6th Cir. 2000) ("[W]hen the requested accommodation has no reasonable prospect of allowing the individual to work in the identifiable future, it is objectively not an accommodation that the employer should be required to provide."); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) ("While it is true that employers may be required . . . to transfer a disabled employee to a vacant position for which he or she is qualified, employers are under no duty to keep employees on unpaid leave indefinitely until such position opens up."); *see also Hudson v. MCI Telecomm. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (finding that an employee who could provide no evidence of how long she would be affected by an ailment could not reasonably request her employer to provide unpaid leave of indefinite duration). A request for a work schedule that contains no guarantee of consistent attendance should be treated in a manner similar to that employed by the authorities cited..

Another line of cases stands as authority for the principle that when a plaintiff concedes he or she cannot fulfill the requirements of a job, summary judgment for the employer is appropriate. *Brickers v. Cleveland Bd. of Ed.*, 145 F.3d 846, 849–50 (6th Cir. 1998) (affirming summary judgment against an employee who admitted she could not lift a sufficient amount of weight to meet the job's requirements); *Townley v. Blue Cross & Blue Shield of Mich.*, 254 F. Supp. 2d 661, 666–67 (E.D. Mich. 2003) (granting summary judgment when the plaintiff admitted in her deposition testimony that, from the date of her termination onward, she was unable to work). Muray admitted in her deposition that from the time of her termination to the present, she could not guarantee consistent work attendance, even on a part-time schedule, due to her illness. The Court concludes that there is no reasonable accommodation that would permit Muray to

resume employment with Dawn. She cannot be considered "qualified" for employment under the ADA, and summary judgment on this discrimination charge for Dawn is therefore appropriate.

II. ADA Retaliation Claim

Muray also claims that her lower-than-expected raise in January of 2008 and eventual termination reflect unlawful retaliation for "protected activity" under the ADA. The ADA prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter," or who has filed administrative proceedings to protest such an action as Muray did in this case. 42 U.S.C. § 12203(a). To make out a prima facie case for retaliation under the ADA, the plaintiff must show (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). The defendant then has the burden of "establish[ing] a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant produces such a reason, the plaintiff must show it is "pretext" for the claim to move past summary judgment. *Id.*

Muray's characterization of her pay *raise* as an "adverse employment action" is untenable. It is undisputed that Muray had no a right to a raise under the terms of her employment agreement. The Court doubts that *any* pay raise in such circumstances could be considered an "adverse" action for ADA purposes, and Muray cites no authority that even suggests it could. Moreover, Muray's attempt to classify the four-percent pay raise as some sort of department "standard" lacks support. At least one individual who worked in the same position as Muray and engaged in no protected

activities received no pay raise at all in January 2008. Def.'s Mot. Tab E, ¶ 7. A disappointing pay raise, standing alone, cannot constitute retaliation when the employer does not promise, in fact or in practice, such raises.

Muray's claim that her termination was retaliation for filing complaints with the MDCR is also meritless, for two reasons. First, Muray failed to produce any evidence from which a jury could determine that the administrative filings and the termination were causally connected. Muray makes vague allegations that her supervisor harassed her regarding her work performance. Def.'s Mot. 15 n.7. These charges, even if true, are not legally adequate to link the protected activity to the allegedly retaliatory conduct. *See Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) ("Conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress"; distress must be "severe"). In the absence of such proof, Muray's only causal argument is that the protected activity and the termination happened within a few months of each other, but proximity arguments of this sort are not legally sufficient to establish causality in a retaliation action. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

Second, even if Muray could show a causal connection between her termination and her MDCR filings, she has not produced evidence showing that Dawn's purported good-faith reasons for terminating her are not true. As was explained in the discussion of Muray's ADA discrimination claim above, Dawn had to terminate Muray because she was incapable of coming to work on any reliable schedule and no suitable positions for her were available. Muray's cursory allegations of harassment do not alter the facts she conceded in her deposition or establish that Dawn's stated reasons for ending their relationship with Muray were mere pretext. *See Smith v. Chrysler Corp*, 155 F.3d 799,

808 (6th Cir. 1998) (holding that an employee has to show a purported reason given by an employer for her termination is "'unworthy of credence'" in order to survive a motion for summary judgment) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). In conclusion, Muray has failed to assert a triable ADA retaliation claim, and summary judgment on this count for Dawn is justified.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Dawn's motion for summary judgment (docket no. 19) is **GRANTED**, and that this case is **DISMISSED**.

**SO ORDERED**.

                                        s/Stephen J. Murphy, III
                                        STEPHEN J. MURPHY, III
                                        United States District Judge

Dated: October 14, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 14, 2010, by electronic and/or ordinary mail.

                                        Alissa Greer
                                        Case Manager